OPINION
Adam Johnston appeals from his conviction in Montgomery County Common Pleas Court of aggravated burglary and aggravated murder. In a single assignment, Johnston contends the trial court erred in refusing to instruct the jury upon the lesser included offense of voluntary manslaughter.
The facts in this case are not seriously in dispute. On March 9, 2000 Johnston contacted his drug connection Bryce Francis, to get him heroin. Francis, along with Bobby Matthews and Suzanne Carlson, went to Johnston's house to get the $40 needed to buy the heroin. Instead of purchasing the heroin, Francis and Matthews ripped Johnston off for the money.
The next day Johnston told his roommate, Terry Wakefield, "I'm going to get those guys." On the following day, March 11, 2000, at approximately 10:00 p.m. Johnston took a shower, dressed himself in black, armed himself with a knife, and again told Wakefield he was to get the guys responsible for taking his money.
When Johnston arrived at Matthews' house, Matthews was outside in his yard. As Johnston pulled into the driveway, Matthews ran into house and locked the door, as Johnston gave chase. Johnston then pounded on Matthews' front door, yelling for Matthews to open it. When Matthews didn't answer, Johnston punched out a wooden panel on the door, reached in and unlocked the door. As Johnston entered Matthews' home, he immediately saw Matthews standing in the living room holding a golf club.
Matthews ordered Johnston to get out of his house, telling Johnston that if he didn't leave immediately he would hit him with the golf club. Johnston refused to leave and began arguing with Matthews. Matthews told Johnston he didn't want to hear anything about the drug rip-off. Matthews swung the golf club at Johnston but did not strike him with it. Johnston then ran at Matthews and tackled him to the ground. Matthews swung the golf club again, this time striking Johnston on the back with the shaft of the club. As Johnston and Matthews began fighting Johnston pulled a pocket knife from his pocket and began to repeatedly stab and slash Matthews in the head, face and neck. Johnston testified at trial that he was "in a real mad state, I was just fighting, I was pretty much out of control." (Tr. 556). Johnston broke the tip of his knife off in Matthews' skull; it was later recovered by the coroner embedded in Matthews' left forehead. Eventually, Johnston was able to get Matthews in a headlock and proceeded to slit his throat at least three times. With Matthews now mortally wounded, Johnston stopped his attack, and both he and Matthews went into the bathroom. Appellant brought the golf club with him.
While Matthews stood near the bathtub trying to clean the blood off of himself, Johnston apologized for having stabbed him. Matthews apologized to Johnston for having taken his $40.00. After talking awhile, Matthews asked Johnston to go to the kitchen and get him a beer and cigarettes. When Johnston returned Johnston testified he and Matthews sat around drinking their beers. Suddenly, according to Johnston, Matthews grabbed the golf club again, but he took the golf club from Matthews and struck Matthews over the head with such force that he fractured Matthews' skull and pushed the skull into the brain tissue itself. Johnston continued striking Matthews with the golf club until the club broke in two places. Holding just the broken shaft of the club, Johnston repeatedly plunged the shaft into Matthews' body, with one blow in particular passing through Matthews' rib cage and puncturing his right lung.
The defendant gathered up his knife, the broken golf club, Matthews' shirt, Matthews' telephone, and various other items from inside Matthews' house, put them all in a trash bag and left. Once home, Johnston threw the knife into the trash and told Wakefield and his half brother, Jason Mavity, to dispose of the trash bag of evidence. The police later found this bag of evidence in the sewer across the street from the defendant's house. The next day, defendant's friend, Ryan Oldiges, threw another trash bag that contained defendant's blood-soaked clothes into a dumpster behind the Wendy's down the street.
The coroner determined that Matthews suffered approximately 39 stab wounds and more than 28 cut wounds. The wounds were concentrated primarily to Matthews' head, face and upper torso. The coroner said the cause of death was multiple blunt and sharp force injuries, including four potentially fatal wounds: (1) cut to throat that severed the jugular vein; (2) skull fracture with underlying brain injury; (3) stab/puncture wound to the chest that collapsed a lung; and (4) complete loss of blood.
At the conclusion of all the evidence, Johnston asked the trial court to instruct the jury on the lesser included offense of voluntary manslaughter. The trial court refused to do so. Appellant contends there was evidence in the record which if believed by the jury was sufficient to reduce the aggravated murder charge to voluntary manslaughter. He notes that he testified that he did not go to Matthews house to kill him but to get his money back. He also notes that the provocation which sent him into a sudden fit of rage was Matthews' refusal to talk to him about the "rip-off" and Matthews' striking him with the golf club.
The State argues that the trial court properly refused to give the manslaughter instruction because "properly defending against an attack cannot qualify as serious provocation for voluntary manslaughter" citing this court's opinion in State v. Young (July 12, 1996), Darke App. No. 1391.
It is conceded by the State that voluntary manslaughter is an inferior degree offense of murder or aggravated murder. State v. Deem (1988),40 Ohio St.3d 205. R.C. 2903.03(A) provides:
 "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is reasonably brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."
Thus, as an inferior degree offense, a defendant charged with aggravated murder is entitled to have the jury instructed on voluntary manslaughter only when the evidence, when viewed in the light most favorable to the defendant, would allow the finder of fact to reasonably conclude that the defendant has established, by a preponderance of the evidence, that he acted under the influence of sudden passion or a sudden fit of rage, either of which was brought on by serious provocation caused by the victim that was reasonably sufficient to incite him into using deadly force. State v. Rhodes (1992), 63 Ohio St.3d 613, syllabus.
Before giving a jury instruction on voluntary manslaughter, it is the trial court's duty to determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented during the trial.State v. Shane (1992), 63 Ohio St.3d 630, paragraph one of the syllabus. This requires the trial court to apply both an objective and subjective standard. Under the objective test, the trial court must determine whether the alleged provocation was reasonably sufficient to bring on a sudden passion or a sudden fit of rage. State v. Mack (1998),82 Ohio St.3d 198, 201. The trial court must determine whether the provocation as alleged was reasonably sufficient "to arouse the passions of an ordinary person beyond the power of his control." Shane at 635. In making that determination, it is the judge who "furnishes the standard of what constitutes adequate provocation, i.e., that provocation which would cause a reasonable person to act out of passion rather than reason." Id. at 634, citations omitted. If this objective test is met, the inquiry then shifts to whether this defendant, in this particular case, "actually was under the influence of sudden passion or in a sudden fit of rage." Id. at 634. It is only at this point that the emotional and mental state of the defendant, as well as the conditions and circumstances that surrounded the incident at the time of the killing, must be considered. Id., citing Deem, supra, at paragraph five of the syllabus. It is the defendant's burden to produce sufficient evidence of a mitigating circumstance before the trial court is required to instruct the jury on voluntary manslaughter. Rhodes at 619-620.
The State argues that Johnston cannot make out a valid claim of "serious provocation occasioned by the victim" from the testimony he presented to the jury. Johnston said the victim was "standing in his house with a golf club telling me to get out of his house. Telling me he was going to hit me if I didn't leave." (Tr. 553). Johnston said they argued for a while and then the victim swung the club and hit him in the back and then he tackled him and then he started stabbing the victim. (Tr. 555). The State argues that there was nothing improper about Matthews' conduct as he was merely defending himself.
Where one is assaulted in his home, or the home itself is attacked, he may use such means as are necessary to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life. State v. Peacock (1883), 40 Ohio St. 333,334. Implicit in this statement of law is the rule that there is no duty to retreat from one's home. State v. Jackson (1986), 22 Ohio St.3d 281,284; State v. Williford (1990), 49 Ohio St.3d 247, State v. Peacock,
supra approved and followed.
The victim was within his rights in using reasonable force to repel the defendant from his home. Thus his act of swinging the golf club at the defendant could not provide the "serious provocation" to reduce the defendant's conduct from aggravated murder to manslaughter. The trial court appropriately refused to give the manslaughter instruction. The appellant's assignment of error is overruled.
The judgment of the trial court is Affirmed.
WOLFF, P.J,. and GRADY, J., concur.